## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-CA-00148-SCT

*R. E. WILBOURN*

*v.*

*STENNETT, WILKINSON & WARD, A PROFESSIONAL CORPORATION AND GENE A. WILKINSON, J. STEPHEN WRIGHT, JAMES C. MARTIN, JAMES R. MOZINGO, STANLEY Q. SMITH, MARK A. CARLSON, ERWIN C. WARD, INDIVIDUALLY, JOINTLY AND SEVERALLY*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/19/93 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | THOMAS L. KIRKLAND, JR. |
| | KATHY S. BOTELER |
| ATTORNEYS FOR APPELLEES: | JOHN C. HENEGAN |
| | MICHAEL O. GWIN |
| | CAMILLE H. EVANS |
| | JAMES A. BECKER, JR. |
| NATURE OF THE CASE: | CIVIL - LEGAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 12/12/96 |
| MOTION FOR REHEARING FILED: | 1/3/97 |
| MANDATE ISSUED: | 2/13/97 |

**BEFORE DAN LEE, C.J., SULLIVAN, P.J. AND ROBERTS, J.**

**ROBERTS, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. This is an appeal of an order from the Hinds County Circuit Court, granting summary judgment denying legal malpractice and dismissing counter claims of malicious prosecution and abuse of process. Richard Wilbourn contacted his long time friend Erwin Ward, a partner at the Stennett, Wilkinson & Ward Law Firm, in 1982 to prepare a bank regulatory filing on his behalf concerning Citizens National Bank stock. Later, the firm prepared a proposed tender offer on his behalf. The attorneys within the firm that performed the legal services for Wilbourn left in 1985 to open their own firm. Wilbourn directed his file to be sent to the new firm. Later in 1985, SW&W became Stennett, Wilkinson & Ward, a professional association. Ward entered the professional association

only as an employee.

¶2. In 1986, Wilbourn and others purchased, from the Johnston family, a large amount of stock in Stonewall Bank, of which Wilbourn was a director. In 1987, the Johnston family decided to file suit against Wilbourn and others, alleging securities fraud and racketeering. As part of damages, the Johnston family requested the court to force Wilbourn to divest himself of Citizens National Bank stock. The Johnston family retained William Ready, an attorney in Meridian, to file suit on their behalf. Ready contacted SW&W, P.A. to associate their help in pursuing the litigation. SW&W, P.A., decided to take part in the representation. Wilbourn notified SW&W, P.A. that Ward and others at the firm held confidential information gained through the earlier representation. The firm wrote to Wilbourn stating all files were taken by the former employees as Wilbourn had directed in 1985. Wilbourn filed suit in 1990 alleging legal malpractice, and naming as defendants all shareholders of SW&W, P.A., Ward and an employee who helped prepare the Johnston suit.

¶3. On January 14, 1990, Circuit Court Judge Fred L. Banks, Jr., granted summary judgment to all defendants except SW&W, P.A. and Ward. On January 14, 1993, after thorough examination of the lengthy record, Circuit Court Judge James E. Graves, Jr., granted summary judgment for the remaining defendants as to the claims of Wilbourn. Also, the counter claims of the individually named defendants were dismissed with prejudice. On January 19, 1993, Judge Graves entered final judgement on all claims.

**I. DID THE TRIAL COURT ERR BY GRANTING THE MOTION FOR SUMMARY JUDGMENT OF GENE A. WILKINSON, J. STEPHEN WRIGHT, JAMES C. MARTIN, JAMES A. PEDEN, JR., DERRYL W. PEDEN, JAMES R. MOZINGO, STANLEY Q. SMITH, MARK C. CARLSON?**

**II. DID THE TRIAL COURT ERR BY GRANTING THE MOTION FOR SUMMARY JUDGMENT OF STENNETT, WILKINSON & WARD, A PROFESSIONAL ASSOCIATION?**

**III. DID THE TRIAL COURT ERR BY GRANTING THE MOTION FOR SUMMARY JUDGMENT OF ERWIN C. WARD?**

**IV. DID THE TRIAL COURT ERR BY DISMISSING THE COUNTER CLAIMS OF ABUSE OF PROCESS AND MALICIOUS PROSECUTION AGAINST WILBOURN?**

**V. DID THE TRIAL COURT ERR BY ENTERING A FINAL JUDGMENT IN THIS CASE?**

## STATEMENT OF THE FACTS

¶4. Wilbourn had acquired stock in Citizens National Bank of Meridian, Mississippi, for many years and has been in competition with others to acquire CNB stock. By 1982, Wilbourn had acquired approximately a 10% interest in the bank and was a director of CNB. Because of his large interest in CNB stock, he became concerned with federal and state regulations. Wilbourn contacted the Stennett, Wilkinson and Ward law firm in Jackson, Mississippi for a number of reasons: (1) SW & W performed bank regulatory work; (2) Wilbourn preferred out-of-town counsel, so that he could keep

his plan to acquire CNB stock confidential; and (3) Wilbourn and Erwin C. Ward, a partner in SW&W, were long time friends or acquaintances.

¶5. In March, 1982, Wilbourn retained SW&W to prepare regulatory filings for his CNB stock interest. Wilbourn contacted Ward by telephone and then met Ward in his office at SW&W. Wilbourn alleges that he confided to Ward: his plan and his reasons to continue to buy CNB stock; the identification and motivation of the parties with whom he was competing to purchase CNB stock; relationships between Wilbourn and those other parties; and, other aspects of Wilbourn's private and confidential business affairs.

¶6. Ward indicated that he did not work in the bank regulatory field and suggested that Anson B. Chunn should handle the work. Ward contends that he has never practiced in the banking regulatory area. Wilbourn expressed his desire that Ward be part of the representation, and Ward agreed to remain involved in the representation. On their next meeting, Ward introduced Chunn to Wilbourn, at which time Chunn was first informed of the representation. Wilbourn discussed with Ward and Chunn his need to file a change in control notice. The purpose of filing the notice of change in control was to allow Wilbourn to lawfully obtain additional stock in the future. After discussion, Wilbourn decided that a tender offer for the purchase of CNB stock was needed as a defensive measure, and also needed to be prepared. The notice of change in control of a national bank was filed on March 19, 1982, with the Regional Administrator of National Banks. Wilbourn mailed a copy of the notice to Ward. However, Chunn and Craig Landrum, an associate, performed all of the work for Wilbourn. The notice of change in control disclosed Wilbourn's personal financial information including his 26% stock ownership of Stonewall Bank and a contingent option to purchase another 26% of the Stonewall Bank stock. Wilbourn stated that his financial statement, which was included in the change in control notice, was not made part of public filing by the regulatory agency. Wilbourn contends that discussions with Ward, Chunn and Landrum involved his stock interest in Stonewall Bank, and his director position with that bank. The tender offer that was prepared was never filed.

¶7. On March 24, 1982, SW&W prepared a new matter report; this report listed Chunn as the attorney responsible for the Wilbourn file with Ward and Landrum as assigned lawyers to the representation. The report indicated the representation was to "review change in control notice and formulate acquisition plan." In addition, the memo to the file was marked as confidential. Chunn, Landrum, Ward, James R. Mozingo, Leigh Patterson, Stanley Q. Smith, Gene A. Wilkinson, Derryl W. Peden, and James A. Peden, Jr. initialed the file to represent no known conflict of interest. Ward contends that, except for the new matter report and initial misdirected letters, he never received any files or documents prepared by Chunn or Landrum on behalf of Wilbourn or any other documents.

¶8. Wilbourn does not claim that any other attorneys, except Chunn, Landrum and Ward, consulted with or performed legal work for him. All other attorneys/defendants deny they have ever performed any professional services for Wilbourn or have knowledge of the substance of his prior representation. Only Chunn and Landrum billed Wilbourn for professional services. SW&W's representation of Wilbourn covered a period of almost three years. During that period, Wilbourn was billed for a total of fourteen (14) hours of services. The hours billed represented work performed by Chunn and Landrum. Wilbourn has never been billed for any time by Ward. A statement dated September 17, 1982, billed Wilbourn for 8.2 hours; a statement dated November 2, 1983, billed 1 hour; a statement dated May 1, 1985, billed 4.8 hours.

¶9. On or about August 20, 1985, Wilbourn was advised that Chunn and Landrum were leaving SW&W to form their own firm. Wilbourn was supplied with a form memo and requested to complete and mail it back to SW&W to direct how his file would be handled. Wilbourn directed that his files be delivered to Chunn and Landrum. Wilbourn handwrote, "I think Bob Chunn worked on everything that I asked of the firm and should probably have the files. I certainly want to be able to call on Mr. Ward in the future, however."

¶10. On August 15, 1985, three of the six partners of SW&W, along with others, formed a professional association known as Stennett, Wilkinson & Ward, a Professional Association. Ward did not join the association as a shareholder, but as an employee only.

¶11. Wilbourn does not contend that Ward performed substantive legal work in his representation; but he does allege Ward held confidential information from the 1982-1985 representation that was misused by SW&W, P.A.. Wilbourn never did call on Ward after the partnership dissolved in 1985. However, Wilbourn contends Ward and the SW&W professional association were still his attorneys, and he was not notified to the contrary until receiving notice of the Johnston complaint. The contacts that Wilbourn alleges constitute a breach of confidentiality by Ward and imputed to SW&W occurred in 1982. By August 20, 1985, the Wilbourn files were in the possession of Chunn and Landrum. SW&W and the individual defendants allege that no files remained with the professional association. SW&W, P.A. claims to only have billing documents relating to Wilbourn and the new matter report.

¶12. In November 1986, Archie McDonnell, Sr., Archie McDonnell, Jr. and Wilbourn, all directors of CNB, acquired 256 of the 700 outstanding shares of Stonewall Bank from the Jessie L. Johnston family. Mrs. Johnston served on the Board of Directors for the Stonewall Bank, as did Wilbourn. In negotiations, no plan was mentioned by Wilbourn or the McDonnell's to merge Stonewall Bank into CNB. Within a few days of the purchase of the stock from the Johnston's, at $1,100 per share, Wilbourn and the McDonnells announced plans to merge the two banks.

¶13. In February 1987, a formal notice of the proposed merger was released. During this same time, the Johnstons received a Stonewall Bank proxy statement concerning the proposed merger. The proxy statement explained that 1 share of Stonewall Bank stock could be exchanged for 17 shares of CNB stock. The proxy also stated the after-merger book value of Stonewall Bank stock would be $1,840.55 a share. The Johnstons felt they had been cheated by Wilbourn and the McDonnell's, primarily because of the undisclosed merger plan during negotiations.

¶14. In the spring of 1987, William Ready, Sr., an attorney in Meridian, Mississippi, contacted Gene Wilkinson with SW&W, P.A. about assisting him in representing the Johnston family in a law suit against Wilbourn and the McDonnells. Steve Wright and Jim Martin were the attorneys with SW&W who actually worked on the Johnston suit. Ward was not involved in Ready's discussions with SW&W nor any other aspect of the arrangement.

¶15. Before filing the Johnston complaint, Ready hand delivered a draft of the complaint to Wilbourn and the McDonnells. Wilbourn and the McDonnells responded in writing claiming their innocence. Wilbourn did not in this letter, or any time prior to the filing of the complaint, express concern regarding SW&W's possible conflict of interest.

¶16. Upon first learning that SW&W, P.A. would represent the Johnston family in suit against

Wilbourn, Ward expressed his personal misgivings to Wilkinson of opposing a long-time friend. However, Ward did not warn Wilkinson of any possible conflict of interest between the Johnston suit and the prior representation of Wilbourn. Ward contends that he has no memory of the prior Wilbourn representation.

¶17. On June 19, 1987, at a CLE seminar in Jackson, Mississippi, attended by both Wilbourn and Ward, Wilbourn commented to Ward about the possibility of a conflict of interest in SW&W's handling of the Johnston suit. Ward claims that this was his first knowledge of any possible conflict of interest. Ward immediately reported the conversation to Wilkinson and J. Peden, directors of SW&W, P.A., and asked that the firm investigate. Ward responded to SW&W, P.A.'s initial inquiry by relating all that he personally recalled about the former partnership's representation of Wilbourn. Ward as an employee, claims no participation, authority or control in the decision by the SW&W, P.A. related to its resolution of the conflict of interest issue or its decision to proceed with the Johnston suit.

¶18. After investigating the subject raised by Ward, SW&W, P.A. decided to go forward and file the Johnston complaint. On July 1, 1987, Jessie L. Johnston, et al. v. Richard Wilbourn, et al., Civil Action No. E87-0074(L) was filed in federal district court. The complaint alleged Wilbourn, as an officer, director and officer of both CNB and the Stonewall Bank: (1) knew that the Stonewall Bank stock owned by the Johnstons would be exchanged for CNB stock prior to purchasing the stock from the Johnstons; (2) violated the Securities Exchange Act of 1934, §§10(b), 10(b)-5 and 17(a); (3) committed fraud in the acquisition of the Johnston stock; (4) filed a false and misleading tender offer; (5) conspired to defraud the Johnstons; and (6) committed unlawful acts through a pattern of racketeering with regard to the sale and purchase of stock in violation of the Racketeer Influenced and Corrupt Organizations Act. As relief, the Johnstons requested: (1) a judgment establishing a constructive trust over a portion of Wilbourn's CNB stock; (2) treble damages; (3) judgment requiring Wilbourn to divest himself of CNB stock and restricting him from performing future executive functions in any national bank; and (4) attorney's fees and costs.

¶19. Wilbourn contends that many of the matters alleged in the Johnston suit relate directly to the matters for which Wilbourn had previously sought legal advice from the SW&W partnership. Chunn, by affidavit, stated that the prior representation of Wilbourn between 1982-85 and the Johnston suit are substantially related. Further, Chunn stated during the representation relating to CNB stock, he understood Wilbourn wanted the nature of the representation to be confidential.

¶20. In August 1987, Wilbourn informed SW&W of what he believed to be a conflict of interest. As a result, the association re-investigated Wilbourn's claim. The association again concluded that no conflict of interest existed. After the investigation, the association made an effort to ensure that Ward was not apprised of the status of the Johnston matter. On August 28, 1987, Wright, on behalf of SW&W, P.A., mailed to Wilbourn a letter indicating the firm had concluded a conflict of interest did not exist, and no attorney in the firm had any knowledge of the former representation of Wilbourn. SW&W, P.A. claims to have thoroughly investigated Wilbourn's claim. No one in the association had ever represented Wilbourn or performed any legal work for him. Wilbourn was not, nor had he ever been, a client of the professional association. Each attorney in the firm has made an affidavit swearing to his complete lack of knowledge of Wilbourn's prior representation. The billing records support Ward's statement that he performed no legal work for Wilbourn.

¶21. On September 17, 1987, Wilbourn filed a complaint alleging a conflict of interest against Steve Wright and Jim Martin before the Complaints Committee of the Mississippi State Bar. The complaint was dismissed without prejudice in January, 1988. The complaint was dismissed because of the ongoing Johnston suit, which made the bar complaint premature. Wilbourn has not brought any subsequent complaint before the bar.

¶22. On January 4, 1990, Wilbourn filed the legal malpractice complaint. Wilbourn named SW&W, P.A. as a defendant, as well as, Wilkinson, Wright, Martin, J. Peden, D. Peden, Mozingo, Smith, Carlson, Alexander and Ward jointly and severally. The complaint alleged: (1) SW&W formerly represented Wilbourn regarding CNB stock and became aware of confidential information which is related to the Johnston litigation in U.S. District Court. SW&W is representing the Johnston family and has filed suit against Wilbourn. SW&W has used privileged and confidential information, gained from the prior representation of Wilbourn, in the Johnston litigation. Defendants have known at all times of their prior representation of Wilbourn, and are proceeding against him intentionally, negligently or grossly negligent in the breach of their fiduciary duties; (2) Defendants violated the trust of Wilbourn and the Code of Professional Conduct by using privileged facts gained through the prior representation of Wilbourn against him now; (3) Defendants tortiously and willfully breached the contract of employment between Wilbourn and the defendants. Defendants have revealed to others the information and thought processes of Wilbourn and have taken an active and adversarial litigation position against him, using said information, facts and materials gained through former representation of the plaintiff, against him; (4) Defendants have breached their duty imposed by law to not represent another person against the plaintiff on the same or substantially the same subject matter; and (5) Defendant's actions are in a direct conflict of interest with Wilbourn. Defendants actions are negligent, reckless, malicious, wanton, intentional and unconscionable. As a result of Defendants' actions Wilbourn has suffered emotional and mental suffering and anguish, and loss of enjoyment of life. Defendants have intentionally and/or were negligent and grossly negligent in defaming and embarrassing Wilbourn. Wilbourn's reputation in the community has been damaged and he has been able to acquire only very small amounts of additional stock in CNB of Meridian.

¶23. Wilbourn does not contend he consulted with Chunn, Landrum, Ward or anyone else at the SW&W partnership, about (1) purchasing Stonewall Bank stock; (2) purchasing stock from the Johnston family; or (3) merging Stonewall Bank into CNB. During the Johnston litigation, Wilbourn denied that his purchase of the Johnston Stonewall Bank stock had anything to do with either the merger of Stonewall Bank into CNB or any plan to increase his holdings in CNB.

¶24. Archie McDonnell, Jr, a co-defendant with Wilbourn in Johnston, testified in his opinion, someone had access to information that was broad-brushed throughout the Johnston complaint. After he became aware the SW&W firm had represented Wilbourn and later represented the Johnstons, it began to "jell in his mind" the drafters of the complaint had: knowledge of the history of CNB stock, and that this type of information was not available to everyone; had a pretty good working knowledge of Wilbourn and the McDonnells; and had a pretty good working knowledge of the patterns in which the CNB stock was bought. Additionally, Archie McDonnell, Jr. and Archie McDonnell, Sr. have testified that CNB has not employed Wilbourn for representation for the securities matters after the Johnston suit as it did prior to the litigation. Previously, CNB had retained Wilbourn for almost all bank matters, but after the McDonnells and others at CNB discovered, as a

result of the Johnston suit, Wilbourn was not an attorney with specialized knowledge in securities matters, CNB has not retained Wilbourn as counsel for securities related matters. Wilbourn offers this testimony as evidence of damages.

¶25. On March 6, 1990, SW&W, and all individually named defendants, with the exception of Ward, filed counterclaims against Wilbourn alleging abuse of process, malicious prosecution, defamation and contravention of the mandates of the Litigation Accountability Act of 1988. Defendants charge Wilbourn filed the malpractice claims in an effort to obtain a collateral advantage in the ongoing Johnston litigation by abusing process. Wilbourn asserts he was merely filing his malpractice claim in a timely manner; because over two years had elapsed since the beginning of the Johnston suit, if a three year statute of limitations were applicable, his claim would become time barred if he had waited much longer before filing.

¶26. At no time had Wilbourn attempted to disqualify SW&W, P.A. from the litigation. On March 30, 1990, SW&W, P.A. filed a motion before U.S. District Judge Tom Lee in the Johnston suit asking the court to determine whether SW&W should be disqualified from continuing to represent the Johnstons. In response, Wilbourn declined to ask the court to disqualify SW&W, P.A.. Wilbourn contends that disqualifying the firm 3 years after the breach of confidentiality would not remedy the damages already caused to him. Accordingly, the court declined to rule on the motion as the only adversely affected person did not support the disqualification motion.

¶27. In the Johnston federal action, U.S. District Judge Tom Lee dismissed, on summary judgment, Johnston's claims of racketeering. The court rendered a directed verdict for Wilbourn on the Johnstons' claim for state fraud and punitive damages. The remaining two issues were tried, and the jury returned a verdict for Wilbourn on both issues. On March 20, 1991, a final judgment was entered in favor of Wilbourn and the McDonnells.

¶28. On September 14, 1990, SW&W, P.A., et al. Filed a Motion for Summary Judgment. On January 7, 1991, Circuit Court Judge Fred L. Banks, Jr., entered an order denying the summary judgment motion as to Ward and SW&W, a professional association, and granted summary judgment as to Wilkinson, Wright, Martin, J. Peden, D. Peden, Mozingo, Smith and Carlson. The court specifically held that pursuant to Miss. Code Ann. §79-9-1, et seq., as well as the common law of the state, shareholders in a professional corporation who have no personal involvement in any alleged act of malpractice, are not subject to personal liability.

¶29. On April 2, 1991, Ward and SW&W filed a second motion to dismiss, or in the alternative, motion for summary judgment. On January 10, 1992, Circuit Court Judge James E. Graves, Jr., entered an order denying the motion for summary judgment of Ward and SW&W.

¶30. On June 1, 1991, Ward left the SW&W professional association.

¶31. On October 28, 1992, Ward filed another motion for summary judgment. On November 13, 1992, SW&W, P.A. filed a motion for summary judgment. On November 16, 1992, Wilbourn filed a motion to dismiss, or in the alternative, motion for summary judgment on the counterclaims of SW&W, et al., contending that he was entitled to summary judgment on the allegations of SW&W, et al., in their counterclaims.

¶32. On January 14, 1993, Judge Graves stated the basis for his ruling: (1) Miss. Code Ann. §15-1-35 (1972) barred the intentional torts alleged by Wilbourn in his complaint as the injury occurred at the time the lawsuit was filed; (2) the claims of Wilbourn against Ward would fail because Ward was an employee of the firm and he was not involved in the decision to represent the Johnston family; (3) Wilbourn's claims against SW&W, P.A. fail because the firm never had a fiduciary duty to Wilbourn, and once Ward is dismissed, the chain is broken, as the fiduciary duty was between Wilbourn and Ward, and SW&W never breached a fiduciary duty to Wilbourn because the duty between SW&W and Wilbourn was never formed. As to the counterclaims against Wilbourn, Judge Graves stated that Wilbourn had colorable claims against SW&W, et al., to defeat the allegations in the counterclaims. Final judgment was entered on January 19, 1993.

¶33. Three years after the legal malpractice suit was brought, Wilbourn had failed to point to any confidential information possessed by Ward or any of the other defendants, and allege that some particular information had been improperly used or disclosed by the defendants. Wilbourn has admitted he does not know of any actual confidential information that was misused or disclosed by the defendants during the Johnston litigation. Rather, Wilbourn merely claims that the SW&W partnership had represented him between 1982-1985, including Ward, and that confidential information had been disclosed to SW&W at that time. Ward was the only attorney employed with SW&W, P.A., at the time of the Johnston suit who Wilbourn claims was involved in his earlier representation.

¶34. Martin, Wright and Mozingo, the attorneys within SW&W, P.A., who handled the Johnston suit, specifically denied that Ward had any involvement in the institution or prosecution of the Johnston case. Wilbourn has not offered any evidence to the contrary.

¶35. The deposition of Landrum and the deposition and affidavit of Chunn reflect the fact the proposed tender offer was prepared by Chunn and Landrum, without any input by Ward. Wilbourn does not allege that anyone else with SW&W ever saw the tender offer. Nor is there any evidence that any information in the tender offer or the existence of the tender offer itself was ever used against Wilbourn.

¶36. Chunn and Landrum took the change in control notice with them when they left to open their own firm in 1985. All of the defendants, including Ward, claim to have no knowledge of the contents of the change in control notice. Federal regulation prescribes the need to file a change in control notice when stock ownership exceeds 10%. 12 U.S.C. §1817; 12 C.F.R. §303.4. By filing the change in control notice, Wilbourn made his ownership interest in CNB public knowledge. Further, the proxy statement sent in February, 1987 to merge Stonewall Bank into CNB contained Wilbourn's status as an officer, director and shareholder of CNB and Stonewall Bank and the percentage of his stock ownership. Further, in the notice of change in control, Wilbourn announced a plan to continue to purchase CNB stock, making it part of the public record. Wilbourn is well known in the community to purchase CNB stock. Wilbourn admitted he often bought, sold and traded CNB stock. Wilbourn further stated he has been approached by others to purchase stock for them.

¶37. Wilbourn alleges the prior representation by SW&W is substantially related to the Johnston lawsuit. Chunn testified to this same conclusion. Wilbourn believes because the former representation and the Johnston suit are substantially related, Ward breached his fiduciary duty when he failed to

object when given the opportunity; and SW&W was negligent and breached contractual and fiduciary duties owed to Wilbourn by accepting the adverse representation against Wilbourn.

## DISCUSSION OF THE ISSUES

¶38. In determining whether summary judgment is appropriate, this Court reviews the issue *de novo*. *Townsend v. Estate of Gilbert*, 616 So. 2d 333, 335 (Miss. 1993); *Spartan Foods Systems, Inc. v. American National Ins. Co.*, 582 So. 2d 399, 402 (Miss. 1991). There is no violation of a party's right to trial by jury when judgment is summarily entered in cases where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Brown v. Credit Center, Inc.*, 444 So. 2d 358, 362 (Miss. 1983).

¶39. Once the absence of genuine material issues has been shown, the burden of rebuttal falls upon the non-moving party. To survive summary judgment, the non-moving party must produce specific facts showing that there is a genuine material issue for trial. M.R.A.P. 56(e); *Fruchter v. Lynch Oil Co.*, 522 So. 2d 195, 199 (Miss. 1988). The non-moving party's claim must be supported by more than a mere scintilla of colorable evidence; it must be evidence upon which a fair-minded jury could return a favorable verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

¶40. Summary judgment is mandated where the respondent has failed "'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Galloway v. Travelers Insurance Co.*, 515 So. 2d 678, 683 (Miss. 1987), *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a party

> opposing summary judgment on a claim or defense as to which that party will bear the burden of proof at trial, fails to make a showing sufficient to establish an essential element of the claim or defense, then all other facts are immaterial, and the moving party is entitled to judgment as a matter of law.

*Galloway*, 515 So. 2d at 684.

¶41. A genuine question of fact must be of a material fact, "the existence of a hundred contested issues of fact will not thwart summary judgment where none of them is material." *Grisham v. John Q. Long V.F.W. Post*, 519 So. 2d 413, 415 (Miss. 1988). If any ground raised and argued below will support the lower court's decision, then the judgment must be affirmed. *Kirksey v. Dye*, 564 So. 2d 1333, 1336-37 (Miss. 1990).

> **I. DID THE TRIAL COURT ERR BY GRANTING THE MOTION FOR SUMMARY JUDGMENT OF GENE A. WILKINSON, J. STEPHEN WRIGHT, JAMES C. MARTIN, JAMES A. PEDEN, JR., DERRYL W. PEDEN, JAMES R. MOZINGO, STANLEY Q. SMITH, MARK C. CARLSON?**

¶42. On January 14, 1991, Circuit Court Judge Fred L. Banks, Jr., granted summary judgment for all defendants except Ward and SW&W, P.A. Summary judgment was granted because, pursuant to Miss. Code Ann. § 79-9-1, et. seq., as well as the common law of the state of Mississippi, shareholders and employees of a professional corporation who had no personal involvement in any alleged act of malpractice are not subject to personal liability. The law in this area is long established

in Mississippi:

> It is universally held, in Mississippi and elsewhere, that the officers, directors, stockholders and employees of a corporation cannot be held responsible for the torts of the corporation unless such officer, director, stockholder or employee personally participated in the commission of the tort, or aided and abetted the commission thereof.

*Grapico Bottling Co. v. Innis*, 140 Miss. 502, 106 So. 97 (1925).

¶43. Wilbourn contends the directors of SW&W, P.A., made the decision to represent the Johnston family in the action against Wilbourn, even after SW&W, P.A., was informed of the former representation. All defendants named by Wilbourn, except Martin, were shareholders and directors of SW&W, but because Martin helped investigate the facts of the Johnston suit, Wilbourn also filed against Martin.

¶44. Professional corporations are formed pursuant to the Mississippi Business Corporation Act, Miss. Code Ann. § 79-4-1, et. seq., Miss. Code Ann. § 79-9-5. Accordingly, shareholders have no liability except to the extent of their personal involvement under Mississippi law.

¶45. Summary judgment was properly granted to these defendants. No evidence was produced or specific allegation made that these defendants held confidences gained through the prior representation. Thus, confidences could not be breached by these defendants. The defendants had no involvement in the prior representation of Wilbourn. Simply pursuing the Johnston litigation does not show these defendants held confidential information, breached or misused that information, or caused Wilbourn's alleged damages.

### II. DID THE TRIAL COURT ERR BY GRANTING THE MOTION FOR SUMMARY JUDGMENT OF STENNETT, WILKINSON & WARD, A PROFESSIONAL ASSOCIATION?

### III. DID THE TRIAL COURT ERR BY GRANTING THE MOTION FOR SUMMARY JUDGMENT OF ERWIN C. WARD?

¶46. On January 15, 1993 Circuit Court Judge James E. Graves, Jr., granted summary judgment to defendant Ward and defendant SW&W, P.A.. Wilbourn's claims for abuse of process, malicious prosecution, defamation and intentional infliction of emotional and mental distress were found to be barred by the one-year statute of limitations, Miss. Code Ann. § 15-1-35, and accordingly, the claims were dismissed with prejudice. Wilbourn does not appeal this part of Judge Graves' order.

¶47. As to Wilbourn's remaining claims, including legal malpractice, Judge Graves ordered that interrogatories be served by defendants' counsel on Wilbourn to seek further discovery of any and all facts the plaintiff had in his possession or that were known to the plaintiff regarding the alleged disclosure and use of the confidential information. A hearing was held January 8, 1993, to hear further arguments. After considering the interrogatories and answers, further argument and remaining record, Judge Graves found no genuine issue of material fact, and granted summary judgment to Ward and SW&W, P.A., in regard to Wilbourn's claims.

¶48. To recover in a legal malpractice case in this state, it is incumbent upon the plaintiff to prove by

a preponderance of evidence the following: (1) Existence of a lawyer-client relationship; (2) Negligence on the part of the lawyer in handling his client's affairs entrusted to him; and (3) Proximate cause of the injury. *Hickox v. Holleman*, 502 So. 2d 626, 633 (Miss. 1987). As to the second factor, a lawyer owes his client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by the members of the legal profession similarly situated. Failure to do so constitutes negligent conduct on the part of the lawyer. *Id.* at 634. As to the third essential ingredient, the plaintiff must show that, but for their attorney's negligence, he would have been successful in the prosecution or defense of the underlying action. *See Thompson v. Ewing's Hatcheries, Inc.*, 186 So. 2d 756 (Miss. 1966); *Nause v. Goldman*, 321 So. 2d 304 (Miss. 1975); *Hickox v. Holleman*, *infra.*

*¶49.* This Court has stated that legal malpractice may be a violation of the standard of care of exercising the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated, or the breach of a fiduciary duty. *Hartford Acc. & Indem. Co. v. Foster*, 528 So. 2d 255, 285 (Miss. 1988).

¶50. This Court has recognized each lawyer owes his client duties falling into three broad categories: (a) the duty of care; (b) a duty of loyalty; and (c) duties provided by contract. *Singleton v. Stegall*, 580 So. 2d 1242, 1244 (Miss. 1991). The duty of loyalty, or sometimes, the duty of fidelity speaks to the fiduciary nature of the lawyer's duties to his client, of confidentiality and of candor and disclosure. *See Mississippi State Bar v. Attorney D*, 579 So. 2d 559 (Miss. 1991); *Singleton v. Stegall*, 580 So. 2d at 1245.

¶51. Wilbourn contends Ward and the SW&W professional association breached confidences gained during the representation between 1982-1985, and thus, breached a duty of loyalty. However, Wilbourn has never stated with specificity the confidences breached. Instead, Wilbourn relies upon the potential for breach of confidentiality. Wilbourn brought this suit in 1990 and, to this date, has not shown or alleged any breach in particularity.

¶52. Defendants contend Wilbourn largely bases his claims upon the Mississippi Rules of Professional Conduct. Regarding a violation of the professional conduct, the Court has stated:

> ...For the moment it is important that we keep well in mind that, in describing the scope of the Mississippi Rules, we have ordered:

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rules. Accordingly, nothing in the rules should be deemed to augment any substantive legal duties of lawyers or the extra-disciplinary consequences of violating such a duty.

*Singleton v. Stegall*, 580 So. 2d at 1244-45. The Code of Professional Conduct is not used as a

measuring stick to determine civil liability for legal malpractice. It is incumbent for Wilbourn to show the harm and resulting damage from the harm to establish liability.

¶53. Wilbourn had been a client of the SW&W partnership between 1982-1985. In 1985, Chunn and Landrum left SW&W to form their own law firm. Wilbourn directed that his file be given to Chunn because he had performed all of Wilbourn's work. After Chunn and Landrum left the SW&W partnership, the firm became SW&W, a professional association. One of the primary reasons for creating a professional association is limited liability. Although Ward had been a partner in the old firm, he entered the SW&W association as an employee. Wilbourn has never been a client of the SW&W, P.A., nor has he ever contacted any of the attorneys of SW&W, P.A., for legal help.

¶54. Wilbourn has not alleged which employee(s) of SW&W, P.A. breached confidences or articulated what those breached confidences are. At deposition, Wilbourn only stated he believes SW&W, P.A. has breached confidences gained through the earlier representation and used those confidences against him in the Johnston suit. Archie McDonnell, Jr. stated he believed SW&W knew something more than the average person about the affairs of CNB and Wilbourn; however he never stated what that "something" was. Chunn stated he believes the earlier representation is related to the Johnston suit.

¶55. Wilbourn has failed to allege SW&W, P.A., and Ward are responsible for his loss, i.e., the Johnston family filing suit against him. In fact, the Johnston family approached another attorney, William Ready. Only after Mr. Ready accepted the Johnston's case did he inquire and ask to associate SW&W, P.A., to pursue the Johnston's claims. Wilbourn has never alleged SW&W, P.A., and Ward are responsible for the Johnston suit or that the suit would not have been filed if not for SW&W. Because of this, Wilbourn has not alleged what confidences were breached and used in the Johnston suit. Without any specific allegations Wilbourn has not differentiated between the Johnston's knowledge of CNB and Wilbourn before associating SW&W, P.A., and after employing SW&W, P.A.. If a complaint is intended to allege a breach of fiduciary duty, it would be necessary to state with particularity the facts which purportedly created the duty that was breached, so that the court could determine as a matter of law whether there was such a duty. *Parker v. Gordon*, 442 So. 2d 273, 275 (Fla. 1983); *See also* 61A Am.Jur.2d Pleading § 18. As presented, Wilbourn's complaint merely makes the conclusory statement that a fiduciary duty was violated. This is not sufficient.

¶56. The case *sub judice* represents an issue of first impression in Mississippi. Other Mississippi cases have dealt with an attorney's fiduciary duties to clients and former clients. However, no Mississippi case has dealt with an attorney's duties to a former client in an adverse action against the former client in a similar matter.

¶57. Other courts have stated the "substantial relationship" test between subject matters of representation must be a reality, involve actual adversity and a breach of confidences. Applying Louisiana law, the Louisiana Court of Appeals, 5th Circuit, stated even if successive proceedings were substantially related, a former client may expressly or tacitly waive his objection to his former attorney's representation of a client whose interests are adverse to the former client. *Barre v. Martin*, 636 So. 2d 1061, 1063 (La. App. 5th Cir. 1994). The Supreme Court of Tennessee considered a case, factually close to the case *sub judice*, involving a law firm suing a former client in a matter related to the earlier representation. *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.*, 813 S.W.

2d 400 (Tenn. 1991). The Tennessee court stated even though the appearance of impropriety may be the basis for disciplinary proceedings against the lawyer, and perhaps the basis for disqualification in a legal proceeding, it cannot be the basis for civil liability without proof of a causal connection between a lawyer's conduct and any claimed damages. *Id.* at 410. The court explained that the lawyer who did not do anything wrong cannot be held liable only because it looks bad, and the conclusive presumption of shared confidences cannot be substituted for a causal connection between the acts of the lawyer and the alleged damages. *Id.* First, Wilbourn is asking this Court to presume Ward and others at SW&W, P.A., held confidences from the partnership's representation of Wilbourn. Second, Wilbourn is asking this Court to presume SW&W, P.A., breached confidences gained from the earlier representation, and used those confidences in the Johnston suit.

¶58. SW&W, P.A., asked the Federal court in the Johnston suit to determine if SW&W, P.A., should be disqualified. When asked if he wanted SW&W disqualified, Wilbourn responded negatively. Wilbourn stated after three (3) years in Federal Court SW&W had already breached the confidences, and to disqualify the firm would hinder the trial. In cases involving successive representations, a party is required to move for his former lawyer be disqualified as soon as he is aware of the conflict, provided the motion for disqualification or the granting thereof would not place the former client at an unfair disadvantage. *See Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir. 1983). The client cannot hold the right in reserve for tactical purposes until it would be most helpful to his position. Failure to move for disqualification at the earliest practical opportunity will constitute a waiver. *See Central Milk Producers Cooperative v. Sentry Food Stores*, 573 F.2d 988 (8th Cir. 1978).

¶59. Summary judgment was proper, although, no Mississippi case on point addresses an attorney's duties during an adverse suit against the former client in a similar matter. The cause of action is not established by merely showing that SW&W and Ward had access to confidential information or that the representation was adverse. Wilbourn must establish, not only SW&W, P.A., and Ward possessed and misused the confidential information but also the fiduciary breach was a proximate cause of the injury. These requirements are consistent with the *Hickox* requirement of proximate cause. Although Wilbourn alleged SW&W, P.A., and Ward breached and misused confidential information, he failed to show the causal connection.

### IV. DID THE TRIAL COURT ERR BY DISMISSING THE COUNTER CLAIMS OF ABUSE OF PROCESS AND MALICIOUS PROSECUTION AGAINST WILBOURN?

¶**60.** Each individually named defendant, except Ward, filed counter claims against Wilbourn. On January 15, 1993, Circuit Court Judge Graves entered an order dismissing with prejudice the counter claims of the defendants against Wilbourn. Defendants appeal the dismissal of their claims for malicious prosecution and abuse of process.

¶61. The defendants' briefs cite their answers to interrogatories to establish their damages. Defendants do not allege, and affirmatively deny the loss of business income as a result of this litigation. However, all interrogatories of Wilbourn asking for any showing of damages or for showing of an improper purpose on the part of Wilbourn in filing the malpractice suit are objected to by the defendants because of the work-product doctrine and attorney-client privilege with the Johnston family. Further, it seems that each cross claim is attempting to use the filing of the Bar

complaint to show Wilbourn's alleged improper purpose. However, the defendants fail to remember the complaint was not filed against SW&W, P.A. but only against Wright and Martin. Defendants stated that additional documents would be produced to show damages. Those additional documents were never produced for the consideration of the lower court. Each defendant submitted identical answers to the interrogatories, except for a dollar amount of damages, where they handwrote or typed an amount, filling in the blank. Each defendant gave deposition testimony equally evasive as the answers to interrogatories. Each defendant stated their individual amount of damages resulted from the time they each spent preparing for the Wilbourn suit. No defendant stated a client had been lost or clients had been refused services because of this suit. Further, no defendant knew of any person who had stated "something" derogatory of the firm or any of its shareholders or employees as a result of the litigation. Judge Graves considered all of the above answers and testimony and then dismissed the counter claims with prejudice.

¶62. Defendants' action for malicious prosecution is unfounded. Elements of malicious prosecution are: (1) institution of original judicial proceedings, either criminal or civil; (2) by insistence of Wilbourn; (3) the termination of such proceedings in favor of the defendants; (4) malice in the instituting of the proceedings; (5) want of probable cause for the proceedings; and (6) the suffering of damages as a result of the action or prosecution. *Page v. Wiggins*, 595 So. 2d 1291, 1293 (Miss. 1992); *Strong v. Nicholson*; 580 So. 2d 1288, 1293 (Miss. 1991); *Miss. Road Supply v. Zurich-American Ins. Co.*, 501 So. 2d 412, 414 (Miss. 1987). Defendants' briefs contained only one paragraph in support of this claim. Defendants contend this issue should not be dismissed with prejudice because the original proceeding has not been terminated. However, like defendant's claim for abuse of process, the defendants fail to show any harm.

¶63. It is generally recognized that the elements essential to sustain the action of abuse of process are: (1) that the defendant made an illegal and improper perverted use of the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of process; and (3) that damage resulted to the plaintiff from the irregularity. *Foster v. Turner*, 319 So. 2d 233, 236 (Miss. 1975). Again, defendants fail to show any harm, and thus cannot make a prima facia showing.

¶64. The dismissal with prejudice of the counter claims was proper and is affirmed.

### V. DID THE TRIAL COURT ERR BY ENTERING A FINAL JUDGMENT IN THIS CASE?

¶**65.** Upon finding of no error, the lower court properly entered final judgment.

<u>CONCLUSION</u>

¶66. After thoroughly considering the record, this court finds the lower court was correct to grant summary judgment for the defendants against Wilbourn's claims. Wilbourn failed to make a causal connection between the breach of the attorney's duty of confidentiality and loyalty to his alleged damages; as such Wilbourn fails to meet the requirements of *Hickox*. Wilbourn alleged in generality SW&W, P.A. and Ward held confidences gained through the earlier representation by the partnership, and those confidences were broken during the Johnston litigation. A cause of action is not established merely by showing the former attorney had access to confidential information, or that

the representation was adverse. The former client must establish not only the attorney held and misused the confidential information but also the fiduciary breach was a proximate cause of the injury. The open motion to strike portions of Wilbourn's brief and designated record is overruled.

¶67. The lower court considered all evidence placed before it, and properly dismissed with prejudice defendants' counter claims. Without touching on the merits of defendants arguments, no showing of actual damages was offered. Finding the lower court properly ruled upon the motions before it, final judgment was properly entered.

**¶68. JUDGMENT IS AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, McRAE, SMITH AND MILLS, JJ., CONCUR. BANKS, J., NOT PARTICIPATING.**